IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JESSE A. BARNES,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )    CIVIL ACTION NO.  3:05cv194-CSC
                                    )                    (WO)
TUSKEGEE UNIVERSITY, *et al*,       )
                                    )
        Defendants.                 )

**MEMORANDUM OPINION AND ORDER**

**I. Introduction**

The plaintiff, Jesse Barnes ("Barnes"), a former employee of defendant Tuskegee University, brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. et. seq,[1] alleging that he was subjected to sexual harassment and terminated in retaliation for refusing the advances of his supervisor, defendant Barbara Williams ("Williams").  He also alleges state law claims of invasion of privacy, outrage and assault and battery.  Barnes names as defendants Tuskegee University; Dr. Benjamin Payton, President of Tuskegee University; Barbara G. Williams, Vice President/ Director of Human Resources Management and Legal Counsel for Tuskegee University; and William L. Lester,

---

[1]  In his complaint, Barnes alleges that he was discriminated against in violation of 42 U.S.C. § 12101, the Americans with Disabilities Act.  (Compl. at ¶ 38).  The court assumes this is a scrivener's error as there is no allegation that the plaintiff suffers from a disability.  Consequently, as a matter of law, the plaintiff is entitled to no relief on this basis.

Vice President and Provost of Tuskegee University.[2]  He seeks compensatory and punitive damages, injunctive relief, and attorney fees.  The court has jurisdiction over this matter pursuant to its federal question jurisdiction, 42 U.S.C. § 1331, and the jurisdictional grant in 42 U.S.C. § 2000e-5.  It has supplemental jurisdiction of the state law claim pursuant to 28 U.S.C. § 1367.  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.

This action is now pending before the court on the defendants' motion for summary judgment.  After careful review of the motion for summary judgment, the briefs filed in support of and in opposition to the motion, and the supporting and opposing evidentiary materials, the court concludes that the motion for summary judgment is due to be granted in part and denied in part.

## II.  The Summary Judgment Standard

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

---

[2]  The plaintiff's claims against defendant Lester relate to Lester's failure to respond to his complaints about Williams' alleged sexual harassment.  Defendant Lester died on February 7, 2006.  *See* Doc. # 20, Suggestion of Death, filed on March  13, 2006.  The plaintiff's claims against Lester are due to be dismissed because Title VII claims may not be maintained against individuals.  *See* Fn. 15, *infra*.  In addition, at the pretrial conference held on April 21, 2006, the plaintiff conceded that all claims against Lester are due to be dismissed and that Lester is due to be dismissed as a defendant in this action.

(1986).[3]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.  If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993); *see also* FED. R. CIV. P. 56(e).  ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts

_____

[3]  In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the court stated:

"[Where the nonmoving party will bear the burden of proof at trial on a dispositive issue...Rule 56(e)...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate  "specific facts showing that there is a genuine issue for trial. . . .We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves. . . .

*Id.* at 324.

showing that there is a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); *Harris v. Ostrout,* 65 F.3d 912 (11th Cir. 1995).

However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all reasonable inferences must be drawn in his favor." *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law FED. R. CIV. P. 56(c). With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

4

### III. Facts[4]

Defendant Tuskegee University ("Tuskegee") is an institution of higher education located in Tuskegee, Alabama.  Defendant Benjamin Payton ("Payton") is President of Tuskegee University.  Defendant William Lester ("Lester") was Provost of Tuskegee University.[5]  Defendant Barbara G. Williams ("Williams") is the Vice President and Director of Human Resources and General Counsel for Tuskegee University.

Plaintiff Jesse Barnes ("Barnes") was employed by Tuskegee University in 1987 as a lab technician in the School of Veterinary Medicine.[6]  (Barnes Dep. at 18-19).  Barnes became the University Safety Officer in the Department of Public Safety and Security in September of 2000. (Barnes Dep. at 19).  Barnes held this position until his discharge from Tuskegee University.

As University Safety Officer, Barnes was responsible for coordinating the storage and removal of chemicals and hazardous waste from the campus and the development of a comprehensive safety plan.  He also served as a point of contact for the Alabama Department of Environmental Management ("ADEM").  Barnes' initial supervisor when he became

---

[4]  The parties have stipulated to some of the following facts, and the court construes the other facts in a light most favorable to the non-movant, the plaintiff in this case.  *See, e.g. Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990).  Thus, the facts as set forth by this court may not be the actual facts, and a trier of fact remains free to decide what are the true facts.

[5]  Dr. Lester died on February 7, 2006.

[6]  The parties stipulated that Barnes began his employment with Tuskegee University in 1982. However, Barnes testified that he began working for Tuskegee in 1987.  (Barnes' Dep. at 18-19).  This disputed fact is immaterial.

University Safety Officer was Willie McDaniel ("McDaniel"), who was the Director of Public Safety and Security.  In September 2001, McDaniel completed an employee appraisal regarding Barnes' performance.  (Def's Ex. 13).  Although McDaniel rated Barnes' competency as "[h]ighly competent and proficient", McDaniel also noted that Barnes "[c]ooperates reluctantly" and "[a]ttains goal but arouses antagonism." (*Id*).  In addition, McDaniel commented that Barnes is a

> [h]ard worker who is knowledgeable about job and takes pride in the product. . . . sometimes extremely difficult to get a point across.  At times reasoning appears to be faulty.  Needs to fully understand chain-of-command and protocol.

(*Id.*)

On April 10, 2003, Williams asked Payton to place Barnes under her supervision "so that we can start organizing the safety program and develop and disseminate procedures and guidelines to, not only, provide a safe environment but also to be in compliance with such agencies as OSHA, EPA, and ADA."  (Defs' Ex. 1 attached to Declaration of Barbara Williams).  Dr. Payton approved this move on May 21, 2003, and on June 1, 2003, Williams became Barnes' immediate supervisor.  Williams remained Barnes' supervisor until he was discharged from Tuskegee University.

ADEM considered Tuskegee University a Large Quantity Generator of regulated waste.  On November 17, 2002, ADEM conducted a compliance and evaluation inspection of Tuskegee University.  On January 13, 2003, Barnes received a letter from ADEM outlining various areas of Tuskegee University that were not compliant with ADEM's

regulations. (Defs' Ex. 14 attached to Deposition of Jesse Barnes). Tuskegee University was given 15 days to submit a written response outlining the corrective actions that would be taken. (*Id*). On February 13, 2003, Barnes submitted a response to ADEM. (Defs' Ex. 15 attached to Deposition of Jesse Barnes). On March 31, 2003, ADEM sent another letter to Barnes specifying the ways in which Tuskegee University's response was still not adequate. (Defs' Ex. 16 attached to Deposition of Jesse Barnes).

Barnes asserts that, in July 2003,[7] Williams touched him inappropriately while in a meeting in Williams' office.[8] Barnes asserts that Williams touched him again in July and August. (Deposition of Jesse Barnes at 41-42). Sometime in August, while in a meeting with him, Williams grabbed Barnes' shoulders and his arm. (*Id*. at 42-43). It was during this meeting that Williams also stared at Barnes' zipper. (*Id*. at 41 & 44).

On August 19, 2003, Donna Adams of ADEM conducted an on-site inspection of Tuskegee University and issued a preliminary inspection report. (Defs' Ex. 17 attached to Deposition of Jesse Barnes). Barnes signed the August 19, 2003 inspection report on behalf of Tuskegee University. (*Id*.) The citations listed in the August 19, 2003 inspection report were substantially similar to the potential citations set out in the January 2003 letter from ADEM.

---

[7] Although Barnes testified in deposition that Williams' first advance was in July 2004, he also testified that Williams began supervising him in 2004. (Deposition of Jesse Barnes at 23). The record is clear that Williams began supervising Barnes in 2003 and Barnes alleges that Williams' inappropriate conduct began shortly thereafter.

[8] With respect to Barnes' allegations of unwelcome sexual contact and comments, Williams vehemently denies that she engaged in any activities as described by Barnes.

On August 20, 2003, Barnes informed Williams about ADEM's August 19, 2003 inspection.  On August 26, 2003, Williams directed Barnes to "forward any calls or written communications regarding [ADEM's inspection] to [her] office."  (Defs' Ex. 18 attached to Deposition of Jesse Barnes).  Williams informed Barnes that "[a]ny violation of this directive will be cause for disciplinary action, up to and including termination."  (*Id.*)

In October or November of 2003, Barnes had a conversation with Dr. Charlotte Morris, the assistant to the President.  In that conversation, Barnes told Morris that Williams had touched him inappropriately in July, had discussed homosexuality with him, and spoke about her personal life with him.[9]  (Deposition of Jesse Barnes at 33-35).  It was also during this time frame that Williams allegedly offered to "Lewinsky" Barnes.  (*Id.* at 49-51).  Barnes interpreted this statement as an offer to perform oral sex on him.  (*Id.* at 51).

Sometime in November, 2003, while discussing the environmental audit report from ADEM, Williams attempted to either step over or around Barnes during the meeting.  (*Id.* at 74-75).  As she did, she placed her pelvis and vagina on his shoulder.  (*Id.* at 77, 83-84, 86).  On other occasions in November, when Barnes would enter Williams' office, she would greet him by touching his legs with her buttocks.  (*Id.* at 89-91).

On November 7, 2003, Barnes submitted to Williams a detailed memorandum regarding an environmental compliance audit.  (Defs' Ex. 21 attached to Deposition of Jesse Barnes).  On November 11, 2003, Williams informed Barnes that his response was

---

[9] Dr. Morris denies that the conversation described by Barnes ever happened.

inadequate and incomplete.  (Defs' Ex. 22 attached to Deposition of Jesse Barnes).  On November 20, 2003, Barnes submitted a supplemental response to Williams.  (Defs' Ex.23 attached to Deposition of Jesse Barnes).  On December 1, 2003, Williams scheduled a meeting on December 4, 2003, with Barnes regarding the environmental audit.  (Defs' Ex. 24 attached to Deposition of Jesse Barnes).

On December 2, 2003, Barnes received a letter from ADEM detailing numerous compliance violations by Tuskegee.  (Defs' Ex. 25 attached to Deposition of Jesse Barnes).

> [ADEM] is surprised at the number and nature of the violations observed during our August 19, 2003, inspection due to previous efforts to provide compliance assistance to Tuskegee University.  Following our inspection of November 7, 2002, the Department issued a compliance assessment report to the University on January 13, 2003 (copy enclosed) that highlighted several items requiring further attention.  In Tuskegee's response dated February 13, 2003 (copy enclosed) you described specific corrective actions to be taken by the University to address those items.  On March 31, 2003, the Department advised you that the corrective actions described in your February letter appeared to be adequate, with two exceptions.  On May 12, 2003, you notified the Department that those items had been corrected.
>
> In addition to these exchanges of correspondence, there have been numerous telephone conversations between you and members of the Industrial Hazardous Waste Branch discussing Tuskegee's compliance efforts.  Despite the Department's attempts to provide compliance assistance and Tuskegee's representation that the issues were corrected, many of the issues found during our November 22, 2002, inspection were again observed during the most recent inspection.
>
> . . . These violations should be corrected within the time frame set above.  Be advised that the Department retains the option to take further action including the imposition of monetary penalties for the noted violations, as well as for failure to comply with the requirements of this notice.

(*Id.*)

9

Barnes testified that Williams made several inappropriate comments to him regarding homosexuality, ejaculation, and "changing men." (Deposition of Jesse Barnes at 94-98). Barnes told Williams that her conversations made him very uncomfortable and asked her not to talk about such matters again. (*Id*. at 98). Thereafter, Williams made no other inappropriate comment to Barnes. (*Id*. at 99).

Nonetheless, sometime in December, 2003, Barnes had another conversation with Morris in which he told her "things were escalating." (Deposition of Jesse Barnes at 36). Barnes also asked Morris to transfer him from Williams' supervision in Human Resources to any other area of the campus. (*Id*. at 37).[10]

Barnes received the ADEM notice of violation letter on December 15, 2003. (*Id*. at 170). Barnes delivered the letter to Williams on December 19, 2003. (*Id*. at 174-175). Tuskegee University was closed for the holidays from December 19, 2003, until January 5, 2004. Williams submitted Tuskegee's response to ADEM on January 9, 2004.

Barnes met with Williams on or around January 12, 2004 to discuss his performance evaluation. Barnes' January 2004 performance evaluation rated him as fair and placed him on probation. (Defs' Ex. 28 attached to Deposition of Jesse Barnes). At that time, Williams rated Barnes as "[s]omewhat competent." (*Id*. at 2). She noted that his weak points included that he submitted 'inaccurate information;' he "fail[ed] to follow through;" and did not "share important information with those who should know." (*Id*.) Barnes disagreed with the

_____

[10] Barnes testified that he last spoke with Morris on December 16, 2003. (Deposition of Jesse Barnes at 40).

evaluation.  (*Id*.)

On January 22, 2004, Williams notified Barnes that he needed to contact Auburn University's Environmental Health and Safety Officer to arrange a site visit for them.  (Defs' Ex. 31 attached to Deposition of Jesse Barnes).

In a January 30, 2004, letter to Barnes, Williams detailed six job-related expectations concerning his attendance, job performance, and judgment.  (Defs' Ex. 33 attached to Deposition of Jesse Barnes).  Barnes was advised that if his performance did not improve he would be subject to immediate termination.  (*Id*.)

"Because of [his] inefficiency, inattention to duty, and negligence in the ADEM matter," on February 2, 2004, Barnes was notified that he would be suspended for two weeks without pay. (Defs' Ex. 34 attached to Deposition of Jesse Barnes).   Barnes was placed on a two-week suspension without pay from February 9 through February 20, 2004.  The letter advising Barnes of his suspension also noted that if Barnes' performance did not improve, he would be subject to immediate termination.

On February 2, 2004, Williams told Barnes that they "didn't have to go to [Auburn University's] hazardous waste facility" but that they could go anywhere Barnes wanted so they could "patch things up."[11]  (Deposition of Jesse Barnes at 54).  On February 3, 2004, Williams telephoned Barnes and asked him why they were taking separate vehicles to

---

[11]  Barnes interpreted this statement to be an offer to "have sex at one of the motels near there, because she said anywhere of your choosing."  (Deposition of Jesse Barnes at 65).  Again, Williams vehemently denies that this conversation ever happened.

Auburn.  (*Id*. at 59).  Barnes informed Williams that he was riding to Auburn with his wife.  (*Id*. at 60).  On February 4, 2004, Williams and Barnes drove separately to Auburn University and met with an employee to discuss Auburn's environmental program.

On February 14, 2004, Barnes and Payton had a lengthy discussion regarding his allegations against Williams.[12]  (*Id*. at 223).  According to Barnes, he and Payton met at a sorority function they were attending with their wives at the Booker T. Washington High School in Tuskegee.  (*Id*. at 224).  Although Payton initially asked Barnes about the ADEM report, Barnes told Payton about Williams touching him inappropriately.  (*Id*. at 225-226).

On February 19, 2004, Barnes wrote a lengthy letter to President Payton complaining that Williams was 'micromanaging' the Environmental Health and Safety Department.  He also complained the Williams was creating 'a hostile environment.'  (Defs' Ex. 35 attached to Deposition of Jesse Barnes).  Barnes complained that Williams had "misused and abused her power as vice-president to intimidate, violate, and dehumanize, and to ultimately destroy [him]."  (*Id*. at 1).  Barnes described the hostile work environment as follows:

> Ms. Williams's (sic) tactics are two-fold in purpose: personal and revengeful.  At the very beginning when Ms. Williams informed me of her asking to supervise me, I raised the question, "Why does this person want to supervise me in an area that she has neither knowledge nor qualifications."  It was not until I started talking with her and discussing my evaluation (when she had missed the evaluation cycle) that I realized that she had no plans to work with me.  Her ultimate plan was to have me under her auspices to evaluate in order to further expedite her plan of action which she told me repeatedly in every

---

[12] Barnes contends that he complained to Payton about Williams' sexual harassment.  Payton admits that Barnes complained to him but Payton asserts that Barnes complained about Williams' handling of the ADEM notice of violation.  Payton denies that Barnes complained of any sexual harassment by Williams.

session: probation, suspension, and termination.  This is a well-orchestrated plan by Ms. Williams as a retaliatory act to terminate me.  In 2001, during the Space Act Agreement, I was reprimanded on more than one occasion by Ms. Williams about not inviting her to ceremonial signings or activities.  She further questioned why my name was on these agreements, and went as far to submit information with a cover letter that was deceiving to President Payton that it was through the auspices of her office, as a means of endorsement. Each time there was any national or local medica coverage concerning the NASA Space Act Agreement, I could count on an explosive verbal attack from Ms. Williams.  This was more evident when a team from Tuskegee University went to NASA Glenn in Cleveland, Ohio as part of the Space Act Agreement. She attempted to keep me from attending, even though I was representing Tuskegee University.  Mr. Porter had to sign the invoices.  She has worked untiringly to discredit and disqualify me with all certifying and qualifying agencies and among administrators at Tuskegee University and to further provide any form of documentation to try and prove my incompetence as determined by her.  Never during these six months has Ms. Williams tried to work through any difficulties or what she perceived as difficulties with me on a professional level.  It has always been a derogatory meeting filled with put-downs and name-calling by her toward me.  She has created the most oppressing, deceitful, conniving working atmosphere that I have ever encountered.  I cannot recall a working environment that can compare to the likes of what Ms. Williams has created for me.

(*Id*. at 2).

Barnes was directed by Morris to take a copy of the letter to the staff senate. (Deposition of Jesse Barnes at 228).  Barnes also met with Dr. Lester twice about his letter. (*Id*. at 216).  During one of those meetings, Barnes told Lester about Williams' inappropriate touching of him.  (*Id*. at 218).

In March of 2004, during a meeting with Williams, Barnes contends that Williams attempted to stop him from leaving her office by unbuttoning his shirt.  (Deposition of Jesse Barnes at 67 - 72).

13

On March 19, 2004, ADEM notified the University that its January 2004 responses to ADEM's December 2003 violations notice was adequate except for eight (8) violations. (Defs' Ex. 38 attached to Deposition of Jesse Barnes). Tuskegee was given an additional fifteen (15) days to attain compliance. (*Id*. at 3). On April 14, 2004, the University submitted a response to address ADEM's concerns regarding these violations. (Defs' Ex. 39 attached to Deposition of Jesse Barnes).

In April, Williams and Barnes inspected the 90-day storage facility. (Deposition of Jesse Barnes at 104-105). At the storage facility, Williams put her hands on Barnes' chest and asked him "why was [he] not giving in to her. What was [his] problem. . . is it my wig I'm wearing?" (*Id*. at 105). She screamed at him that she was "going to get" him. (*Id*. at 105-106).

On May 10, 2004, Barnes signed an EEOC charge alleging that he was the victim of unwelcome sexual harassment, physical touching, and sexual comments from Williams. He also alleged that he was suspended in retaliation for complaining about the sexual harassment. (Defs' Ex. 40 attached to Deposition of Jesse Barnes).

Barnes was on a leave of absence from May 12 through June 4, 2004. On June 15, 2004, Williams informed Barnes that his work performance was unsatisfactory.[13] Due his "inattention to duty, inefficiency, and lack of integrity," Barnes was suspended for two

---

[13] Although Williams asserts that she originally wrote the letter on May 11, 2004, it is undisputed that she did not give the letter to Barnes until June, 2004. *See* Defs' Ex. 41 attached to Deposition of Jesse Barnes.

weeks, from July 12 until July 23, 2004.  (Defs' Ex. 43 attached to Deposition of Jesse Barnes).  He was also warned that any future performance problems could result in the termination of his employment.  (*Id*.)

On June 18, 2004, ADEM advised Tuskegee University that it was proposing certain administrative actions to force Tuskegee into compliance to ADEM's environmental rules and regulations.   (Defs' Ex. 45 & 46 attached to Deposition of Jesse Barnes).  The proposed administrative order also contained an assessment of a civil penalty as a result of repeated violations by Tuskegee.  (*Id*.)

On June 25, 2004, Tuskegee received notice from the EEOC that Barnes had filed a charge of discrimination.

Williams completed Barnes' employee appraisal on June 30, 2004.  She recommended Barnes be terminated because his job performance was poor, highly inaccurate, the amount of work done was inadequate, and he was incompetent.

By letter dated July 16, 2004, Barnes was notified that he was being terminated, effectively July 19, 2004.  (Barnes Dep. at 12; Defs' Ex. 46 attached to Deposition of Jesse Barnes).  "The reasons for termination include gross negligence or failure to perform your job, inattention to duty, inefficiency, insubordination, dishonesty, and lack of integrity." (Defs' Ex. 46 attached to Deposition of Jesse Barnes).

On August 9, 2004, Barnes filed an amended EEOC charge complaining that Williams sexually harassed and retaliated against him.  In his charge, Barnes complained that

he had been sexually harassed since August 2003.  He filed this action on March 2, 2005.

## IV.  Discussion

### A.  Objection to the Defendants' Declarations

Before addressing the defendants' summary judgment motion, the court addresses the plaintiff's objections to the defendants' declarations.  Although not in the form of a motion, the plaintiff requests that the defendants' declaration be stricken as they are not sworn.  (Pl's Resp. in Opp. to Defs' Mot. for Sum. J. at 3).  Barnes argues that the declarations, or portions thereof, should be stricken as they are conclusory, not based on personal knowledge and are irrelevant.  The defendants have since substituted sworn declarations for the unsworn declarations.  More importantly, however, the court is capable of sifting through the affidavits and considering only those portions which are either based on the declarant's personal knowledge, *see* FED. R. CIV. P. 56(e), or are relevant to the issues at bar.  To the extent that the affidavits contain information that is either irrelevant or not based on personal knowledge, the court has not considered that material in resolving the motion for summary judgment.

### B.  Sexual Harassment

Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin in a variety of employment practices.  *See Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995).[14]  It is well-settled that an employer[15] may be liable under

---

[14] 42 U.S.C.A. § 2000e-2(a)(1) provides: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

Title VII for subjecting an employee to sexual harassment in the workplace. *Meritor Sav.*

*Bank v. Vinson*, 477 U.S. 57, 65-66 (1986).  The Eleventh Circuit has adopted a five-prong

paradigm for analyzing sexual harassment claims.   Specifically, the plaintiff must

demonstrate that: (1) he is a member of a protected group; (2) he was subjected to

unwelcome sexual harassment; (3) the harassment was based on his sex; (4) the harassment

was severe or pervasive so as to alter the conditions of his environment and create a hostile

or abusive working environment; and (5) there is a basis for employer liability.  *Gupta v.*

*Florida Bd. of Regents,* 212 F.3d 571, 583 (11th Cir. 2000); *Mendoza v. Borden, Inc*., 195

F.3d 1238, 1245 (11th Cir. 1999); *Merriweather v. Ala. Dep't of Pub. Safety*, 17 F. Supp. 2d

1260, 1271 (M.D. Ala. 1998).

The plaintiff can pursue a claim of sexual harassment by either establishing that he

was subjected to (1) a tangible employment action because he refused to submit to his

supervisor's sexual advances, or (2) sufficiently severe or pervasive conduct that altered the

---

individual with respect to her compensation, terms, conditions, or privileges of employment, because of such
individual's race, color, religion, sex or national origin."

[15] Title VII claims may not be maintained against individuals. *See Dearth v. Collins*, ___ F.3d ___,
2006 WL 525539, *1 (11th Cir. March 6, 2006) (No. 05-12039); *Busby v. City of Orlando*, 931 F.2d 764, 772
(11th Cir. 1991).  Furthermore, a plaintiff seeking to recover money damages against persons in their official
capacities "must look to the government entity itself." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *see
also, Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999); *Vineyard v. County of Murray, Georgia*, 990
F.2d 1207, 1210 n.3 (11th Cir. 1993); *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989) ("For
liability purposes, a suit against a public official in his official capacity is considered a suit against the local
government entity he represents.").  Therefore, the plaintiff's Title VII claims against the individual
defendants are due to be dismissed.

terms and conditions of his employment to rise to the level of a hostile work environment.[16]

*See Hulsey v. Pride Restaurants, Inc.*, 367 F.3d 1238, 1245 (11th Cir. 2004).

> In *Ellerth* and *Faragher*, the Supreme Court indicated that courts should no longer use the labels "*quid pro quo*" and "hostile environment" to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment. Instead, when analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions. Under this analysis, when a supervisor engages in harassment which results in an adverse "tangible employment action" against the employee, the employer is automatically held vicariously liable for the harassment. In contrast, when the supervisor's harassment involves no adverse "tangible employment action," an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the *Faragher* and *Ellerth* cases ("*Faragher/Ellerth* affirmative defense").

*Frederick v. Sprint/United Management Co.,* 246 F.3d 1305, 1311 - 1312 (11th Cir. 2001)

(internal citations and footnote omitted). *See also Madray v. Publix Supermarkets, Inc.*, 208

F.3d 1290, 1296 - 97 (11th Cir. 2000). The employer is subject to vicarious and strict liability

---

[16] The court notes that, in brief, the parties devote an inordinate amount of attention to a discussion of the severe or persuasive element of sexual harassment claims which, in the context of the claims presented in this case, is immaterial. Barnes' sexual harassment claim rests on allegations that he suffered a tangible employment action because he refused to submit to his supervisor's sexual advances. *See Husley v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004). "One way [to establish sexual harassment has altered the terms or conditions of employment] is if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against [him]." *Id.*

In this circuit, "if a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of 'severe or persuasive.'" *Johnson v. Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501, 508 fn. 7 (11th Cir. 2000). Consequently, the court need not consider whether the conduct about which Barnes complains is severe or persuasive, because as a matter of law, it is.

for a supervisor's sexual harassment that results in a tangible employment action.[17]  *Cotton v. Cracker Barrel Old Country Store*, 434 F.3d 1227, 1246 (11th Cir. 2006).  Consequently, if Barnes is successful on his tangible employment action sexual harassment theory, Tuskegee is vicariously liable for Williams' conduct.

Barnes contends that he was subjected to sexual harassment that culminated in adverse employment action because he was suspended twice and subsequently terminated.  "To prove sexual harassment in violation of Title VII, a plaintiff may rely on one of two theories.  Under the first theory, the plaintiff must prove that the harassment culminated in a "tangible employment action" against [him.]"  *Cotton*, 434 F.3d at 1231(citation omitted).  "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits."  *Davis v. Town of Lake Park, Fl.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (quoting *Ellerth*, 524 U.S. at 760- 61 (emphasis in original)).  The defendants do not dispute that Barnes suffered adverse employment actions when he was suspended and then terminated.  However, the defendants dispute that any tangible employment action was causally connected to any alleged sexual harassment of Barnes.

Barnes alleges that Williams (1) made sexually offensive comments and sexual

---

[17]  The court does not consider the issue of the affirmative defense created by *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus. Inc., v. Ellerth*, 524 U.S. 742 (1998), if the supervisor's harassment "culminates in a tangible employment action such as discharge, demotion, or undesirable assignment."  *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

innuendo intending to engage him in a sexual relationship with her;[18] (2) touched him in an offensive manner on his arms and biceps; (3) touched his penis and rubbed her buttocks against him; (4) attempted to undress him in her office; (5) grabbed his chest; and (6) placed her pelvis and vagina on his shoulder and upper arm.   If Barnes' testimony is credited, a reasonable jury could conclude that Williams' conduct escalated from unabashed staring at his body, to allusions about his willingness to engage in an extramarital affair with her, culminating with inappropriate and offensive touchings.  Barnes further contends that as a result of his rejection of Williams' overtures to him, he was suspended twice and then terminated.  Consequently, a reasonable juror crediting Barnes' testimony could conclude that Barnes was sexually harassed by his supervisor, Williams.[19]

Williams, on the other hand, vehemently denies that she made any inappropriate comments to Barnes, said anything that could remotely be construed to be of a sexual nature to Barnes, or touched him in any manner whatsoever.  Williams contends that Barnes was suspended and then terminated for his failure to adequately and accurately perform his job duties.  If the jury credits Williams' testimony, a reasonable jury could conclude that Barnes was not sexually harassed by Williams.  At the summary judgment stage, the court's function

---

[18]   The law is well established in this Circuit that "a victim [of sexual harassment] need not provide evidence of a direct and express sexual demand to make a claim under the "tangible employment action" analysis." *Frederick*, 246 F.3d at 1312.

[19]   The defendants argue that Barnes' testimony and other evidence should be rejected because it is internally inconsistent or so implausible that no reasonable fact finder would accept it.  Of course, the court does have authority to grant summary judgment in the face of incredible or wholly untrustworthy evidence. *See e.g., Baker v. Norman*, 651 F.2d 1107 (5th Cir. 1981).  After careful consideration, the court concludes that the evidence in this case does not rise to such a level of incredibleness that it can be rejected.

is not to weigh evidence or determine the truth of the matter but merely to decide whether there are genuine issues of material fact for trial.   *Anderson*, 477 U.S. at 249-50. Consequently, the court concludes that there are genuine issue of material fact regarding whether Barnes was  subjected to sexual harassment by Williams.[20]

### C.  Retaliation Claim

In order to establish a prima facie case of retaliation, the plaintiff must demonstrate that (1) he participated in protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relationship between the two events.[21]  *Gutpa*, 212 F.3d at 587; *Olmsted v. Taco Bell Corp*., 141 F.3d 1457, 1460 (11th Cir. 1998).  In addition, the causal connection requirement under Title VII must be construed broadly.   *E.E.O.C. v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1571-72 (11th Cir. 1993) ("a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated").   Once the plaintiff makes out a prima facie case of retaliation, "the burden shifts

---

[20]  There are also disputed issues of act about whether Tuskegee had notice of Barnes' allegations and took appropriate remedial action.  Barnes testified in deposition that he complained to both President Payton and Provost Lester that Williams was sexually harassing him.  Defendant Payton denies that Barnes ever complained to him.  Lester is since deceased and there is no statement in the record from him regarding any conversations he may have had with Barnes.

[21]  Title VII provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (1982).

to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997).  If the defendant offers a legitimate reason for the adverse employment action, the presumption of retaliation disappears.  *Id*.  The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.  *Olmsted*, 141 F.3d at 1460.

The defendants argue that Barnes cannot establish a *prima facie* case of retaliation because they did not learn of Barnes' EEOC complaint until after the decision to suspend and terminate Barnes had been made.  The court disagrees.  Protected expressions are not limited to EEOC complaints.

> Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment.  *See, e.g., Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) ("[T]he protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [Barnes], who informally voice complaints to their superiors or who use their employers' internal grievance procedures.")

*Johnson v.Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501 (11th Cir. 2000).

It is undisputed that Barnes suffered a tangible employment action when he was suspended and subsequently terminated.[22]   Barnes contends that his suspensions and termination were in retaliation for reporting and complaining about Williams' sexual

---

[22]  The defendants argue that the first suspension in February 2004 cannot be used to support Barnes' retaliation claim.  The court pretermits discussion of this specific issue because it is clear that Barnes subsequently suffered a tangible employment action.

harassment.  According to Barnes, he complained to Dr. Morris in November and December 2003, to Dr. Payton in February of 2004 and to Dr. Lester in March 2004, all before he was suspended or terminated.  The defendants deny that Barnes complained to any University official about Williams' alleged conduct and they did not learn about his complaints until they received the EEOC charge on June 25, 2004.  They further contend that the decision to suspend and terminate Barnes was made in May, before the University had notice that Barnes had filed an EEOC charge.  "[A] temporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation."  *Cotton*, 434 F.3d at 1232.  Clearly, there are disputed issues of fact regarding whether Barnes made any complaints to University officials about Williams's alleged conduct, when the defendants learned of Barnes' complaints, and whether those complaints were causally connected to his suspensions and termination.  Accordingly, the defendants' motion for summary judgment is Barnes' retaliation claim is due to be denied.

### D. STATE LAW CLAIMS

**1.    Invasion of Privacy Claim.**  Invasion of privacy is defined as "the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person or ordinary sensibilities."  *Carter v. Innisfree Hotel, Inc.* 661 So. 2d 1174, 1178 (Ala. 1995); *see also Lee v. Longhorn Steaks of Alabama, Inc.*, 662 So. 2d 672, 675-676 (Ala. 1995).   The plaintiff describes his claim as follows.

> Certainly, Williams intruded into the Plaintiff's physical solitude or seclusion.
> Plaintiff alleges that Williams constantly called his home inquiring of his

23

illness.  (See Exhibit A, ¶ 46, Ins. 1-3) When Williams, Barnes' supervisor, asked him what kind of illness he had, she had invaded his privacy.  Wrong intrusion occurs if there has been abrupt, offensive, and objectionable prying into information tat (sic) is entitled to be private.  See *Hogin v. Cottingham*, 533 So.2d 525 (Ala. 1988).  Also, Williams knowing (sic) published false information about the Plaintiff which she knew or should have known would have reached the general public.  She told a vendor with Tuskegee University that Plaintiff was critically ill.  This vendor told his church, and the church held a prayer vigil for the Plaintiff.

If Williams published false information about the Plaintiff to only one person, she should have known that the manner in which she communicated this information, she should have known it would become public.  Consequently, the Defendants[' motion] (sic) for summary judgment should be denied.

(Pl's Res. in Opp. to Defs' Mot. for Summ. J. at 34).

In his declaration, Barnes asserts that Williams called his house twice – once to ask for a key and once to ask "What type of medical problem do you have?" (Barnes' Decl. at ¶ 40 & 45, p. 7).  In addition, Barnes asserts that a representative from Perma Fix, a chemical removal company, told him that Williams had given the representative "the impression that I was critically ill." (*Id*. at ¶ 46).  Barnes cannot rely on hearsay to create a genuine issue of material fact, but even if these events did occur, the court concludes that the plaintiff has failed to establish that the communications were done "in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person or ordinary sensibilities." *Carter, supra*.  The defendants' motion for summary judgment is due to be granted on this claim.

2.      **Tort of Outrage Claim.**[23]  The plaintiff alleges that the conduct he endured

---

[23]  In Alabama, the torts of outrage, outrageous conduct, and intentional infliction of emotional distress are the same cause of action.  *Stewart v. Matthews Indus., Inc.*, 644 So. 2d 915, 918 (Ala. 1994).

24

at Tuskegee University was sufficiently egregious to constitute the tort of outrage.  The

Alabama Supreme Court first recognized the tort of outrage, or intentional infliction of

emotional distress, in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).

> In *Inmon,* the Court held that to present a jury question the plaintiff must
> present sufficient evidence that the defendant's conduct (1) was intentional or
> reckless; (2) was extreme and outrageous; and (3) caused emotional distress
> so severe that no reasonable person could be expected to endure it.

*Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993).  The Alabama

Supreme Court has declined to impose liability against an employer except in the most

egregious cases.  *BSE Indus. Contr. Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).

To establish a claim of the tort of outrage, the plaintiff must demonstrate that "(1) the

defendant[] either intended to inflict emotional distress, or knew or should have known that

emotional distress was likely to result from the[] conduct; (2) that the defendant[]'s conduct

was extreme and outrageous; and (3) that the defendant[]'s conduct caused emotional distress

so severe that no reasonable person could be expected to endure it."  *Callens v. Jefferson

County Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000) (*citing American Road Serv. Co. v.

Inmon*, 394 So. 2d 361, 365 (Ala. 1980)).

The plaintiff has not come forward with sufficient evidence to survive summary

judgment because the plaintiff has failed to present evidence on each element of his claim.

Specifically, the plaintiff failed to present any evidence that he suffered extreme emotional

distress as a result of the alleged sexual harassment sufficient to survive summary judgment.

Accordingly, the defendants' motion for summary judgment is due to be granted on this

claim.

> **3.     Assault and Battery Claim.**   Under Alabama law, assault and battery is defined as a touching by one person of the person or clothes of another in rudeness, in anger, or in a hostile manner.  *Ex parte Atmore*, 719 So. 2d at 1195; *Peterson v. BMI Refractories*, 132 F.3d 1405, 1412 (11th Cir. 1998); *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986).  A subjective intent to injure is not an element of the cause of action.  *See McDonald v. Royal Globe Ins. Co.*, 413 So. 2d 1046, 1049 (Ala. 1982).

> > To succeed on a claim alleging battery, a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.

> *Ex parte Atmore,* 719 So. 2d at 1193.  An assault under Alabama law consists of

> > an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.

> *Peterson*, 132 F.3d at 1412; *See also, Morrow*, 973 F. Supp. at 1409 (holding that conduct must be accompanied by menacing or offensive comments).  Barnes asserts that Williams touched him in an unwanted and offensive manner.  Specifically, Barnes alleges that when Williams attempted to "johnnystep" over him when he was seated in her office, she placed her pelvis and vagina against his shoulder and arm.  He also asserts that Williams would walk beside him and press her buttocks against him.  Finally, he alleges that Williams touched his arms, biceps, chest and on one occasion, attempted to unbutton his shirt.   Williams

vehemently denies that she ever touched Barnes at all, let alone an offensive or unwanted manner. The law is "well-settled that Alabama does not recognize an independent cause of action for sexual harassment. Instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage." *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 983 fn.1 (Ala. 1999) (collecting Alabama cases). For the reasons as already stated, there are genuine issues of material fact about Williams' actions, which turn on issues of credibility, which precludes summary judgment on Barnes' claim of assault and battery premised on his claim of sexual harassment.[24] Accordingly, Williams' motion for summary judgment on Barnes' assault and battery claim is due to be denied.

## IV.  CONCLUSION

For the reasons as stated, it is

ORDERED as follows:

1.     That all claims against defendant Lester be and are hereby DISMISSED and defendant Lester be and is hereby DISMISSED as a party in this action.

2.     That the defendants' motion for summary judgment on the plaintiff's invasion of privacy and outrage claims be and is hereby GRANTED and that these claims be and are hereby DISMISSED with prejudice.

---

[24] Although Alabama law recognizes that there may be cases in which claims of sexual harassment rise to the level of the tort of invasion of privacy or outrage, for the reasons already stated in the body of this recommendation, this is not one of those cases.

3.      That the defendants' motion for summary judgment on the plaintiff's Title VII sexual harassment and retaliation claims be and is hereby DENIED.

4.      That the defendants' motion for summary judgment on the plaintiff's claim of assault and battery based on Williams' conduct be and is hereby DENIED.

Done this 24th day of April, 2006.


                            _____/s/Charles S. Coody_____
                            CHARLES S. COODY
                            CHIEF UNITED STATES MAGISTRATE JUDGE

28